Ms. Butt could perform her past work as a pre-school teacher, the second is whether the ALJ properly considered the opinion of the subsequent treating physician, and the last is whether the ALJ properly considered Ms. Butt's testimony herself. The first issue I think warrants a remand for further proceedings. The ALJ stated in her findings of residual functional capacity that Ms. Butt could not engage in any reaching or any work, which would include pushing, pulling, reaching above shoulder level with her right dominant arm. The judge never asked that specific question of the vocational expert. Instead, the judge asked the vocational expert to assume an individual that could engage in occasional reaching above shoulder level, which is different. The vocational expert in her testimony stated that with respect to exertion that employers typically discouraged pre-school teachers from lifting children. Discouraging is different than prohibiting. With respect to the reaching issue, she said that you can reach with either arm and that reaching is very rare. But that doesn't mean that working or reaching never happens with the non-dominant arm, and the limitation is no work above shoulder level. With one arm. Say that again. With one arm, not the other one. Correct. With her dominant arm. And so the commissioner cites Gutierrez in their answering brief, which was decided after we filed the opening brief, and the court uses its common sense understanding. And so the common sense understanding would be are there ever circumstances where a pre-school teacher or any teacher is going to get a box of supplies, no matter what the weight, that is light but bulky, which is going to require the use of both hands. And even if it happens. To lift above your shoulders. That seems unlikely. Reach shelves in a closet. The child part I understand, but. Say that again. The child part I understand, but the other part I don't know. The vocational expert conceded that there's some, and some is more than none. And so discouraging is, and discouraging is different than prohibiting. You can discourage people from doing all types of things. That doesn't mean that they're prohibited from doing them. And so there's an issue with children lifting, picking up and carrying children. The second issue that Ms. Boot presents today is the consideration of Dr. Pelosian's opinion. Dr. Pelosian examined the claimant for the first time in July of 2013, expresses his opinions, which were in front of the ALJ in August of 2013, and then before the Appeals Council presents another opinion in 2014, which indicates that there's more than one visit, but we only have one chart note. A single chart note forces the ALJ to articulate specific and legitimate reasons for rejecting that opinion. And the ALJ's best reason is that it's inconsistent with the opinions of the two consultative examiners and Dr. Dini that reflected treatment and her condition at a prior point in time. And so when we look at these doctors' opinions that are separated, both in terms of their objective findings, because Dr. Pelosian found spasm and decreased motion and other abnormalities with respect to Ms. Boot's condition, it's separated objectively by the differences in findings, but also by the lapse of time. And the idea that an individual's medical condition, once examined by a consultative examiner, is static is not true. The Dr. Dini, didn't he say essentially the same thing in December? He did say essentially the same things in a later opinion after his 2012 permanent and stationary report, after his post-surgical opinions were expressed. Dr. Dini did, in fact, say the same things as Dr. Pelosian. And he said he saw her every two to three months. I'm sorry, Your Honor. He said he saw her every two to three months, so he would have seen her more recently, too. Correct. Which means that they have both seen something different than was in existence in 2012. And did the ALJ ever mention this Dr. Dini opinion, the second one? I'm sorry, Your Honor. Did the ALJ ever mention the second Dr. Dini opinion, the later Dr. Dini opinion, when he said that Dr. Pelosian was in conflict with everybody? In fact, he wasn't in conflict with everybody. The ALJ states that the later opinion is inconsistent with his prior findings, but not inconsistent with Dr. Pelosian's. It doesn't put them together in the same box and look at them and the record as a whole as reflecting a 2013 condition. And inconsistent with prior findings, that's not necessarily inconsistency in the sense that the doctor is making a mistake if the doctor is seeing her at different times. Well, her underlying condition has changed. Exactly, exactly, Your Honor. Which is why we encourage people to continue to go back to the doctor because things do change. They get better, they get worse. In light of those medical findings that she did get worse and the inference that she did get worse, the reasons for rejecting Ms. Boot's testimony just dissolve. There isn't a substantial reason for rejecting her testimony that she isn't able to engage in the significant walking and standing, that the relief from the knee surgery turned out not to be longstanding, and her ability to reach and push-pull is extremely limited. Let me ask a quick question for you, counsel. One of the doctors, Dr. Enriquez, says in a functional assessment that she can occasionally lift or carry 100 pounds. Is there anything else on the record? I just know at my boxing gym we have these big bags on the floor, heavy bags, and there's like a 60 and an 80 and there's like a 100. To pick up the 100, that's pretty hard. And so I was surprised to see that the doctor said she could occasionally do this. I don't mean to belittle her physical strength, but is there anything else on the record? The reason I ask this, not just to be funny, is that if there's a doctor's statement that seems so off, can we, as a court review unit, can we just discount it? Much like we say if a patient says something odd, is there anything on the record that supports this 100-pound assessment by Dr. Enriquez? I think that the court can disregard it for all purposes because the ALJ disregarded it by making findings of medically determinable severe impairments that are wholly inconsistent with Dr. Enriquez and assessing a residual functional capacity that is a tacit, if not an explicit, rejection of everything that Dr. Enriquez says. And my experience is the same as your Honor's. I don't go to the gym to work out. I go to watch my son, but picking up the 80-pound dumbbell, I actually broke the rack, so they threw me out. I'll reserve my remaining two minutes and 20 seconds. Good morning, Your Honors. May it please the Court to see Mody on behalf of Defendant Appellee Nancy A. Berryhill, Acting Commissioner of Social Security. Did the commission on the appeal say anything about the second part of the appeal? The second Dr. Pelosi opinion, I think, are you referring to the opinion that is found on page 17 of the record? That was submitted, as I understand it, to the Appeals Council. That is correct, Your Honor. Did the Appeals Council say anything about it? They're just denying it. I believe the Appeals Council notice addressed that subsequent evidence had been submitted but noted that it was not relevant to this case. Oh, I see. This new information is about a later time. How do we know that? Because, Your Honor, Dr. Pelosi, in his opinion that was dated May 27, 2014, noted that his conclusion that Claymo was disabled, he noted that Claymo was disabled as of May 27, 2014, which is a time period that was three months after the ALJ issued her decision. And I believe, actually, that this subsequent opinion from Dr. Pelosi is notable because it only serves to underscore the ALJ's appropriate rejection of Dr. Pelosi's first opinion because Dr. Pelosi issued two opinions that Claymo was disabled, one in August 2013, one in May 2014. And the one he issued in May 2014 said that he actually didn't find her disabled until May 2014, again, which was three months after the ALJ's decision. And so that in itself is inconsistent with his earlier opinion where he found that Claymo was disabled. Where is it? Just tell me where that is. Your Honor, that is, again, I think on page 17 of the administrative record. And this is Dr. Pelosi's second opinion. Well, he said what is the earliest date that the description of symptoms and limitations in this questionnaire applies? May 27, 2014, because that's when he saw her, right, for this report? Yes, Your Honor. Well, he didn't say that that was, it doesn't say that's the earliest date that she was disabled. Well, it refers to, in this opinion, he's setting out. Well, we know that he said earlier essentially the same thing. So it can't be the earliest date that she was disabled, according to him. He was just being honest and saying this is the earliest date this applies because today is when I saw her. You know, I'm having trouble with handwriting. I'm on AR-17 and so on. What are you directing my attention to? I'm sorry, Your Honor. The opinion begins on 17, but the. Pardon me? Your Honor, the opinion itself, the questionnaire begins on page 17, Your Honor, but I think the date that Judge Burrs and I were referring to is found on page 21. 21? Yes, Your Honor. Okay, so. What is the earliest date that the description of symptoms and limitations in this questionnaire applies? 5-27-2014. Date of the report is 5-27-2014 in the next slide in the signature. Oh, but that's, your interpretation is nonsense. What's the earliest date that the description of symptoms and limitations in this questionnaire applies? And he says, as of now. I read that as saying, well, I'm examining her today. And that's what I'm certifying, as of today. I don't read that question as asking was she disabled prior to this time. Well, Your Honor, I think that's a valid interpretation as well. But for purposes of this case, and as we know, the Appeals Council noted this opinion was not part of the record because it was issued after the ALJ's decision. So going back to the opinion that was properly before the ALJ, the August 2013 opinion, that is the one that claimant raised in her opening brief. Right. And that's the issue, the opinion that's issued in this case. And the ALJ did consider that opinion and properly rejected that opinion. I don't really understand how this works, but it is not pertinent that six months later the same doctor has been seeing her monthly, fills out another form and says this is her situation, which is consistent with the earlier one. You don't have to take the information about what was true in May, but the fact that it was consistent with the earlier one has no relevance? Well, Your Honor, the ALJ did address, are we referring to Dr. Dini's opinion, Your Honor, the one that was issued in December 2013? No, I'm talking about, well, the second Pelosian one, which confirms the first Pelosian one, and a Dini one, which confirms the Pelosian one. So there is certainly, I mean, I don't know whether we count the second Pelosian one. My understanding is you can submit information to the Appeals Council, right? Yes, Your Honor. But it has to be information that deals with the period before the ALJ hearing? Is that it? Yes, Your Honor. It has to be prior to the date of the ALJ's decision, which in this case was February 21, 2014. Okay. And isn't this at least pertinent to the degree of saying that Pelosian is still seeing the same thing he saw before, to confirm what he saw before, that he wasn't just a fly-by-night? Well, it can be construed as another piece of evidence possibly in support of Clayman's allegations. Okay. But against that piece of evidence is the other evidence that the ALJ considered and cited in the decision. But a lot of it was just earlier. That's where all of it was. I mean, the problem is that the most contemporary statements by Dini and by Pelosian, which were the two last ones, I think, were completely consistent with each other. Well, I think Dr. Dini's second questionnaire, I think it isn't particularly relevant in this instance for a couple reasons. First of all, Clayman doesn't contest the ALJ's rejection of Dr. Dini's second opinion. So, in essence, Clayman has waived his challenge to the ALJ's rejection of Dr. Dini's opinion. So we don't believe it's appropriate to rely on an opinion that Clayman herself concedes was not – was properly rejected. That should not be viewed as support for Dr. Pelosian's opinion when – If I ask him whether he conceded that, you think he's going to say he did? Where did he concede it? He didn't specifically contest the ALJ's reasoning in rejecting that opinion in the district court briefing or in the appellate briefing. But he didn't concede it. He just didn't contest it. It wasn't distinctly argued, and I think that is consistent with this Court's waiver precedent. All right. But – so going back to Dr. Pelosian's August 2013 opinion, the ALJ did reject this opinion because – for a couple of reasons. First, noting that it was a one-time examination. And I know that – and Clayman argues in their brief that the agency often relies on one-time examinations to support its non-disability findings, those consultative examinations. But our position is that not all one-time examinations are created equally. On one hand, you have consultative examinations, which are specifically designed to aid in the disability evaluation. They're intended to be sort of comprehensive. But that's why it's relevant that months later, when he submitted to the Appeals Council a document that said he was seeing her every two and three months and it was still – and he still had the same opinion. Well, I think – I think Dr. Pelosian's opinions are – again, they're pieces of evidence that tend to support Clayman's claims, and that's perfectly valid. But I think for the purposes of reviewing the ALJ's decision, it's also worth noting that the ALJ examined the record that was before her that did not include Dr. Pelosian's opinion, and that all that evidence, after considering that, determined ultimately that Clayman could perform her past relevant work as a preschool teacher. And so, again, the evidence that the ALJ cited to support her findings included the unremarkable examinations that Dr. Dini performed in November 2011 and November 2012. Dr. Lim, the consultative examinator, who also examined Clayman in November 2012 and ultimately determined that Clayman could perform a range of medium work, which was also a conclusion reached by the state agency reviewing physician in December 2012. We also have Dr. Dini's observations that Clayman had no evidence of fusion in her left knee. We have the benign January 2012 electrodiagnostic testing that found no evidence of radiculopathy, no atrophy, negative straight leg grazing, and no evidence of weakness in Clayman's lower extremities. These are all unremarkable objective findings that the ALJ considered and then, based on their findings, reasonably determined that Clayman could perform a range of light work and then was able to thus return to her past relevant work as a preschool teacher. Now, again, there might be an alternative interpretation of all of this evidence, and that's perfectly valid, but under this Court's What about the credibility finding? Well, Your Honor, the ALJ, in her evaluation of Clayman's symptom testimony, I think seized upon inconsistencies between her allegations and the objective medical evidence and inconsistencies between her allegations and what she ultimately admitted that she could do on a day-to-day basis. Starting first with the objective medical evidence, to go back, I don't want to recite the evidence again, but the ALJ noted that despite Clayman's claims of debilitating pain and symptoms, the record is devoid of findings that are commensurate with those allegations. And as this Court has held in Ossenbrock and Minnell and other cases, findings such as disused muscle atrophy, weakness, neurological dysfunction, those are typically associated with a disabling physical condition, and none of those findings were present in this instance. And so based on that divergence, the ALJ reasonably determined that Clayman's claims were not persuasive. And I think it's also interesting that the ALJ specifically asked the Clayman at the hearing about certain inconsistencies between her and Clayman about, you know, if she had any limitations in her left upper extremity. And then Clayman alleged that she had dysfunction throughout her left upper extremity, and then the ALJ noted, well, the evidence doesn't support that. And when confronted with that question, Clayman essentially conceded the point. And so these are the kind of inconsistencies that support the ALJ's adverse finding. Similarly, when it comes to the activities of daily living, it's important to note, again, that the ALJ was not attempting to somehow link her activities of daily living to trying to claim that they were strenuous or that they translated to full-time work. The ALJ was not required to do so under this Court's precedent in Molina and Turner and Valentine. The ALJ only had to establish that they contradicted her claims of a totally debilitating impairment. And that's what the ALJ did. I don't understand that part. I mean, if she said he relied on what she said to Dr. Bagner, but that was in 2010. So that's completely irrelevant, right, to what was going on now. Actually, we don't believe it is, Your Honor, because it's important that the claimant first applied for disability benefits in 2010 when she was working full-time as a preschool teacher. The claimant then applies in 2011, the claim that's at issue here. But her activities of daily living were essentially equivalent to both in 2010 and during the period that's under adjudication here. In 2010, to Dr. Bagner, the claimant... with someone else driving. Now she's saying that she can do simple meal preparation, lighthouse work for a few minutes, as I recall, and occasional shopping and social activities. But she said almost never, as I recall. And to Dr. Bagner, the claimant also stated, again, when she was working full-time that she only occasionally, I think, met with people and had no hobbies and pastimes. In other words, even when she was working full-time... She was lying before is what you're saying. No, Your Honor. I don't say she was lying before. I think the point that I think the ALJ was making is that claimant's activities were always limited in a way, even when she was working full-time. Maybe they were self-limiting, but to the extent that there is a consistency between what she can do when she was working full-time and when she alleges that she was unable to work that undercuts her overall claims of disability. And I think there was also another example of that at the hearing as well, where the ALJ asked about her activity and noted that basically her weight had remained largely the same, even when she was working and when she wasn't. Which, again, I think bolsters the ALJ's point that her activities, to the extent that they were limited, were essentially self-limited, and she could still do activities that undercut her claims of disability. Okay. Any further questions from the bench? Thank you. All right. Thank you, Your Honor. The government requested that the court affirm the ALJ's decision. Thank you. I wanted to clarify something that Mr. Mody said about the record. The ALJ said that the record is confusing about whether it's the right shoulder or the left shoulder. Ms. Boot was just very clear and very adamant. It's just the right shoulder. She was not cornered into it. She just said it. She was the right shoulder. And to state that there's no objective support for her complaints of pain and dysfunction is to ignore the really detailed findings that Dr. Pelosian provided in the chart note for July of 2013. It's just replete with findings that are consistent with what her complaints are. So I would urge that the court reverse and credit her testimony and the opinions of Dr. Pelosian. Thank you. Okay. Thank you very much. I think I'm going to pronounce the name correctly now. Boot v. Bearhill now submitted for decision.
judges: W. Fletcher, Berzon, Owens